UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FARINA FOCACCIA & CUCINA ITALIANA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>700 VALENCIA STREET LLC,<br><br>Defendant. | Case No. 15-cv-02286-JCS<br>Related Case No. 15-cv-04931-JCS<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I. INTRODUCTION

The disputes between the parties in these related cases fall into two categories: 1) those related to the question of whether Farina Focaccia & Cucina Italiana, LLC ("Farina") is legally entitled to remain in possession of the commercial property located at 700 Valencia Street, San Francisco, CA; and 2) those arising out of the construction of Farina Pizza in that space by 700 Valencia Street LLC ("700 Valencia") and John O'Connor. Pursuant to a stipulation by the parties, the undersigned conducted a bench trial on November 7 and 8, 2016 to resolve the first set of disputes. After considering and weighing all the evidence and the parties' arguments, and having assessed the credibility of the witnesses, the Court enters the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).[1]

## II. FINDINGS OF FACT

### A. Individuals and Entities

1. Farina is a Delaware Limited Liability Company. Farina operates Farina Pizza, which opened in August 2012, and another restaurant, Farina Focaccia & Cucina Italiana. Both

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

1

1  restaurants are located in San Francisco but only Farina Pizza is located in the commercial space at
2  700 Valencia Street that is the subject of this action.  Luca Minna is the head of Farina.  As
3  discussed further below, the Court finds Minna's testimony was somewhat, but not entirely,
4  credible.

5  　　　　2.　　James H. Kostelni worked for Farina between April 2012 and September 2012,
6  helping with licensing, permitting and construction in connection with the opening of Farina
7  Pizza.  Previously, in 2006 and 2007, he worked for Farina in connection with the build-out of its
8  other restaurant, Farina Focaccia & Cucina Italiana.  Kostelni had had disputes with O'Connor in
9  2006 in connection with the previous restaurant and he had a difficult relationship with O'Connor
10  in connection with the build-out of Farina Pizza as well.  Kostelni accused O'Connor of sloppy
11  work in connection with the construction of Farina Pizza and criticized O'Connor for being hard
12  to communicate with because he "speaks his Irish gibberish" when he gets agitated.  In general,
13  Kostelni was not a credible witness.

14  　　　　3.　　Mateo Giacomazzi was a manager employed by Farina from September 2011
15  through February 2015.  Giacomazzi's testimony was generally credible.

16  　　　　4.　　Erica McDowell was an independent contractor who worked for Farina in the
17  upstairs office of Farina Pizza intermittently.  She worked there in the fall of 2014 and early 2015
18  after Luca asked for her help because the office was "a mess."  The Court finds that Ms.
19  McDowell's testimony was inconsistent and almost entirely unreliable.

20  　　　　5.　　Marius Popescu was an employee of Farina between 2013 and 2016 who started
21  working as a server at Farina Pizza and later became a manager.  He sometimes helped people
22  who worked in the upstairs office of Farina Pizza.  Popescu was not a credible witness.  His
23  testimony was internally inconsistent and inconsistent with the testimony of multiple other
24  witnesses.

25  　　　　6.　　700 Valencia is a California Limited Liability Company.  John O'Connor is an
26  agent of 700 Valencia.  O'Connor's testimony was somewhat credible.

27  　　　　7.　　Global Trading & Marketing, LLC is a management company that began providing
28  management services for Farina Pizza around January 2015.  It was created by Minna in the fall of

1   2014 to provide new management of Farina's restaurants and was headed by a longtime friend of

2   Minna, Michael Blitzer.   Blitzer's testimony was somewhat credible.

### B.   The Lease

8.   On May 30, 2010, 700 Valencia and Farina entered into a Commercial Lease ("Lease") for the property located at 702-706 Valencia Street ("the Property").

9.   The original term of the Lease was for five years: from May 1, 2010 through April 30, 2015, with rent set at $8,000/month for the first three years of the Lease and $8,400/month for the last two years of the Lease.   Lease ¶¶ 2, 4.

10.   The current fair market rental value of the Property is $12,000/month.

11.   Rent was to be paid "in advance, on the first day of each month."   In addition, the Lease provided for late charges and interest on rent payments not paid within five days of the due date.   Lease ¶¶ 6, 7.   Farina understood that its rent payments had to be received by the fifth day of the month to avoid late charges under the Lease and that there was no "grace period" that allowed Farina to make its rent payments later in the month.

12.   The Lease included options to renew for two additional five-year periods after the original term of the Lease. The provision addressing the terms of the options provides, in relevant part, as follows:

> 56  TENANT'S OPTION TO EXTEND TERM
>
> 56.1 If TENANT shall not be in default in performing any of TENANT'S obligations under this Lease, TENANT shall have the option to extend the term of this Lease on all the provisions contained in this Lease, except for minimum monthly rent, for two additional periods of five years each commencing on May 1, 2015 and ending on April 30, 2020 for the first period (herein referred to as "Option Term One") following expiration of the Original Term, by giving notice of exercise of the option (herein referred to as "Option Notice") to LANDLORD at least THREE (3) months, but not more than SIX (6) months, before the expiration of the original term.   TENANT shall have the option to extend the term of this Lease and all its provisions except for minimum monthly rent for a second and final option period (herein referred to as "Option Two") following expiration of Option Term One, by giving notice of exercise of the option (herein referred to as "Option Notice") to LANDLORD at least THREE (3) months but not more than SIX (6) months, before the expiration of termination of Option Term One. Such notices shall be in writing and delivered by certified mail to LANDLORD.

3

Lease ¶ 56. Pursuant to this provision, the option renewal period for Option Period One was between October 31, 2014 and January 31, 2015. Under the Lease, the rent for Option Periods One and Two was to be $8,820/month and $9,702/month, respectively. Lease ¶ 56.6.

13. The Lease contains a provision prohibiting subletting of the Property without the written consent of the Landlord, providing in relevant part as follows:

> 26. ASSIGNMENT AND SUBLETTING:
> 26.1. LANDLORD's Consent Required. TENANT shall not sell, assign, mortgage, pledge, hypothecate, encumber or otherwise transfer this Lease or any interest therein, and shall not sublet the Premises or any part thereof, or suffer or permit the Premises or any part thereof to be occupied by any other person (the agents, employees, and invitees of TENANT excepted), without the prior written consent of LANDLORD in each instance; and any attempt to do so without such consent shall be voidable and, at LANDLORD's election, shall constitute a noncurable default under this Lease. No interest of TENANT in this Lease or the Premises shall be assignable by operation of law. Subject to the terms and conditions contained in this section, LANDLORD shall not unreasonably withhold its consent to a voluntary assignment of this Lease or a subletting of the Premises.

Lease ¶ 26.1. Paragraph 26.2 requires that requests for permission to assign or sublet be made to the Landlord in writing "at least thirty (30) days prior to the proposed effective date of the assignment or sublease" and that the Tenant provide the Landlord with "such financial information as LANDLORD may request concerning the proposed assignee or subtenant, including recent financial statements and bank references." Lease ¶ 26.2.

### C. Construction of Farina Pizza

14. The Property is a mixed-use property and the building on the Property, though new, was an empty shell when the parties entered into the Lease.

15. Farina hired 700 Valencia and John O'Connor as a general contractor to build a restaurant called Farina Pizza in the building on the Property.

16. Farina Pizza opened in August of 2012, over two years after the commencement of the initial five-year Lease term.

### D. The ABC Liquor License Application

17. On May 23, 2012, an application ("Application") for a liquor license was submitted to the California Department of Alcoholic Beverage Control ("ABC") for the Property in the

name of James H. Kostelni.

18. Kostelni filed the Application in his name because the individual at Farina who ordinarily would have filed the application on Farina's behalf was not available. Minna knew that Kostelni filed the ABC Application for Farina Pizza in his own name.

19. On the Application, John O'Connor was listed as the landlord, but instead of listing his address as 700 Valencia Street LLC, 49 Rockaway Avenue, San Francisco, CA 94127, where Farina sent its rent checks and other official correspondence, the address Kostelni provided for O'Connor on the Application was Apartment 1, 700 Valencia Street, San Francisco, CA 94110. At that time, Farina was renting that unit for the use of one of the managers of Farina Pizza, Mateo Giacomazzi, and Kostelni knew that O'Connor did not receive mail there.

20. On January 7, 2013 and again on October 2, 2013, ABC sent letters addressed to O'Connor asking him to provide a copy of the lease showing that Kostelni was the tenant of 700 Valencia and that 700 Valencia LLC was the landlord. O'Connor testified credibly that he did not receive these letters because they were sent to an address where he does not receive mail.

### E. The Kostelni Sublease

21. Minna testified at trial that in February 2013, he asked O'Connor for permission to add Kostelni to the Lease as a cotenant in order to comply with the requirements of the ABC. Minna testified that he was aware that there had been friction between O'Connor and Kostelni in 2012 in connection with construction disputes about the build-out of Farina Pizza and knew that O'Connor might not agree to his proposal for that reason but nonetheless hoped to persuade O'Connor to modify the Lease on the basis that it would not harm 700 Valencia in any way. O'Connor testified that he was "99% certain" that Minna did not ask him to put Kostelni on the Lease in February 2013 (or any other time) and that Minna would not have asked O'Connor to do this because he knew that O'Connor's relationship with Kostelni was "so-so." The Court does not find the testimony of either O'Connor or Minna to be completely credible but does not make a finding as to whether either Minna or O'Connor was telling the truth on this question.

22. On October 7, 2013, Farina manager Mateo Giacomazzi sent O'Connor an email asking O'Connor to modify the Lease to replace Farina as the tenant with "James Hugo Kostelni

(doing business as FARINA PIZZA & CUCINA ITALIANA)." Giacomazzi explained that the reason Farina was requesting the modification was that ABC had requested (in the October 2, 2013 letter referenced above) that Farina provide a copy of the Lease showing that Kostelni was listed as a tenant of 700 Valencia. Trial Ex. 16.

23. Two days later, on October 9, 2013, Giacomazzi followed up with a text message to O'Connor asking if O'Connor had received his e-mail. O'Connor responded, "yes got your email don't think that can be accomplished will run it by attorney." *Id*. The next day, Giacomazzi responded:

> It is only paperwork to get the final license with the abc (JH Kostelni was the one applying for the alcohol license). It can be voided right after we get the license. The master lease will remain the same as it is now. Please let me know. We have a due date for tomorrow.

O'Connor, in turn, responded:

> How do you propose to do this. Construction final payment has not being received rent December 2010 not made You want me to transfer lease to JH no financials no credit check in good faith Legal advice is not to do this.

Trial Ex. 17.

24. On October 12, 2013, James Kostelni sent to ABC, via fax, a signed agreement with Farina to sublease 702, 704 and 706 Valencia Street ("the Sublease") in support of the Application for a liquor license previously submitted. Trial Ex. 35. The Sublease was back-dated May 1, 2012 but Kostelni actually signed the document in October 2013. By its terms, the Sublease expired on April 30, 2015.

25. Based on the October 7, 2013 email from Giacomazzi to O'Connor, the Court concludes that O'Connor was aware that Farina had a problem related to the ABC Application because it was in Kostelni's name. Nonetheless, the Court finds credible O'Connor's testimony that he did not learn of or see the Sublease until that document was produced by the ABC in connection with this action, in 2015.

F. **Exercise of the Option to Renew**

26. Minna and Blitzer testified somewhat credibly that on the weekend after

6

Thanksgiving, in late November 2014, they prepared a letter to exercise the option to renew under the Lease ("the December 1, 2014 Option Renewal Notice" or "Option Renewal Notice"). That letter was introduced into evidence at trial and was dated December 1, 2014. It stated, in relevant part, as follows:

> With reference to the Commercial lease agreement (lease) between 700 VALENCIA STREET, LLC (Landlord) and FARINA FOCACCIA & CUCINA ITALIANA, LLC (Tenant) of the real property known as 702, 704 and 706 Valencia Street, San Francisco, California 94110 (Premises), this notice is to exercise, effective as of January 1, 2015, the Tenant's option to extend term in accordance to Clause 56 of the Lease (Option Term One).
>
> Option Term One extends the term of the lease on all the provisions contained in the lease, except for minimum monthly rent, for an additional period of five years, commencing on May 1, 2015 and ending April 30, 2020.
>
> In accordance to Clause 56.6 of the lease, for Option Term One period, from May 1, 2015 to April30, 2020, the rent shall be $8,820 (eight thousand eight hundred twenty) per month.

Trial Ex. 3.

27.     700 Valencia questions the authenticity of the December 1, 2014 Option Renewal Notice and at trial offered evidence suggesting that it was not created until after the option renewal period had expired, on January 31, 2015.   Because the Court finds that there is insufficient evidence to establish that Farina actually sent the Option Renewal Notice to 700 Valencia by certified mail, as required under the Lease, the Court does not decide whether that document is genuine or when it was created.  Instead, the Court assumes for the purposes of deciding the issues before it in these related cases that the Option Renewal Notice was drafted in the manner described by Messrs. Minna and Blitzer at trial.

28.     At the summary judgment stage of the case, Farina submitted a sworn declaration by Erica McDowell, signed June 17, 2016, to establish that the Option Renewal Notice was sent to 700 Valencia by certified mail on December 9, 2014.  McDowell stated in her declaration that: 1) pursuant to Minna's instructions, on December 9, 2014 she made a copy of the Option Renewal Notice and placed the original in an envelope that she sent, by Certified Mail, return receipt requested, to Mr. O'Connor; 2) the last four digits of the Certified Mail stamp on the envelope that

contained the Option Renewal Notice were 2843; 3) that she sent a separate envelope to O'Connor on December 12, 2014 containing rent checks, including a rent check for December 2014, also by Certified Mail, with last four digits 2850, but did not request a signed receipt for that delivery; and 4) that she subsequently received a receipt with the last four digits 2843 signed by Mr. O'Connor and reflecting that he had received the envelope on December 12, 2014. Trial Ex. 9. If true, this testimony would establish that Farina sent the Option Renewal Notice to 700 Valencia on December 9, 2014 by certified mail and that the notice was actually received by John O'Connor. The Court cannot credit the statements in McDowell's declaration, however, for the reasons stated below.

29. First, O'Connor testified that the only certified mail envelope he received from Farina during this time period was one that contained the December rent check. The Court finds this testimony credible, supporting the conclusion that the return receipt O'Connor signed on December 12, 2014 (for the Certified Mail stamp number ending in 2843) was for the envelope that contained the December rent check and not the Option Renewal Notice. This conclusion is supported by the fact that the rent was already 8 days late by the time this envelope was sent and also by O'Connor's testimony, which the Court found credible, that Farina had sent several other rent checks by certified mail.

30. Second, to the extent that McDowell stated in her declaration that the certified mail envelope for the Certified Mail stamp number ending in 2843 contained the Option Renewal Notice (rather than the rent check), the Court declines to credit that testimony. McDowell testified at trial that she had signed under penalty of perjury a declaration containing misstatements of fact that was filed in a separate judicial proceeding, admitting that she simply signed what was presented to her without reading the declaration. *See* Trial Ex. 8. The Court has no confidence that the same is not true of the declaration McDowell submitted in this case.

31. The Court's conclusion that McDowell's testimony is entirely unreliable finds further support in the fact that she offered inconsistent testimony as to *how* the certified mail envelope she says contained the Option Renewal Notice made its way into the mail at all. While she testified prior to trial that she remembered personally taking the envelope containing the

Option Renewal Notice to the Pleasant Hill Post Office to mail, she conceded at trial that she must not have mailed the envelope herself because the stamp on the envelope showed that it was sent from a post office in San Francisco. Although she speculated that Marius Popescu must have taken the envelope to the post office, she had no specific memory that he had.

32. Further, the testimony of Popescu offers no basis to conclude that Popescu mailed the envelope containing the Option Renewal Notice (whichever of the two certified mail envelopes it might have been in). He had no specific memory of any of the events surrounding the preparation or mailing of the two envelopes, denied that he had worked in the office (though Giacomazzi, McDowell and O'Connor all testified that he did) and also denied that the handwriting on the recipient address portion of the certified mail envelope for which O'Connor signed was his, even though McDowell testified that it was Popsecu's handwriting and not hers.

33. While Blitzer testified that he was in the office on the day McDowell prepared the certified mail package containing the Option Renewal Notice and testified that he saw McDowell place it in an envelope, he also testified that he did not know who actually took the envelope to the post office. Nor did he offer specific testimony about the Certified mail stamp number on the envelope that would allow the Court to draw a reasonable inference that the Option Renewal Notice was placed in the certified mail envelope that O'Connor received and signed for.

34. In light of the inconsistent and unreliable testimony offered by Farina's witnesses, the Court credits O'Connor's statement that he did not receive a certified mail envelope containing a notice seeking to exercise the option under the Lease and further finds, by the preponderance of the evidence, that Farina did not send the December 1, 2014 Option Renewal Notice to 700 Valencia by certified mail.

**G.  Denial of Renewal Option by 700 Valencia**

35. On March 30, 2015, 700 Valencia sent a Notice of Expiration and Non-Renewal of Lease informing Farina that the Lease would expire on April 30, 2015 and would not be renewed. Trial Ex. 13.

**III.  CONCLUSIONS OF LAW**

36. Under California law, an option may be accepted or exercised only in strict

compliance with its terms. *See Renewable Land, LLC v. Rising Tree Wind Farm, LLC*, No. CV 12-0809 RT, 2013 WL 497628, at *1 (E.D. Cal. Feb. 7, 2013) (citing 1 Corbin on Contracts § 264 (1963)). It is well-established that "an option . . . constitutes an irrevocable offer that can be converted into an enforceable contract only by acceptance on the terms specified in the offer." *Simons v. Young*, 93 Cal.App.3d 170, 180 (1979); *see also Bekins Moving & Storage Co. v. Prudential Ins. Co. of America* 176 Cal.App.3d 245, 251(1985) ("tenant must apprise the lessor in unequivocal terms of his unqualified intention to exercise his option, within the time, in the manner, and on the terms stated in the lease"); *Palo Alto Town & Country Vill., Inc. v. BBTC Co.*, 11 Cal. 3d 494, 498 (1974)("when the provisions of an option contract prescribe the particular manner in which the option is to be exercised, they must be strictly followed.").  Because Farina has not established that it exercised the option to renew in the manner required under Paragraph 56.1 of the Lease, namely, by delivering it by certified mail to 700 Valencia, it did not properly exercise the renewal option for Option Term One.

37.  Even if Farina had strictly complied with the terms of the Lease with respect to the time and manner of exercising the renewal option, the Court concludes that it was not entitled under Paragraph 56.1 of the Lease to exercise the option because it was in default in performing its obligations under the Lease.  In particular, Farina failed to obtain 700 Valencia's written consent to the sublet of the Property Farina executed with James Kostelni, as required under Paragraph 26.1.

38.  It is accepted under California law that in the context of the landlord-tenant relationship, a lease may not be terminated based on a breach by the tenant unless the breach is as "material," "substantial," or "total."  *Superior Motels, Inc. v. Rinn Motor Hotels*, Inc., 195 Cal. App. 3d at 1032, 1051(1987).  Further, California Civil Code section 3275, which provides that "[w]henever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty." Cal. Civ. Code § 3275.  As the Court explained on summary judgment, these principals have been applied even in the context of renewal options:

"both the California Supreme Court and the Ninth Circuit, applying California law, have recognized that at least under *some* circumstances, a landlord's refusal to extend or renew a lease pursuant to an option agreement may give rise to a forfeiture such that the principles of equity come into play." Summary Judgment Order at 16. With the benefit of the evidence and testimony presented at trial, however, the Court now concludes that the principals of equity do not come into play under the facts here.

39. As the Court explained in its summary judgment order, "breaches of contractual provisions limiting the right to sublet may well be material, even if the lessee continues to be liable for breaches of the lease by the subletter." Summary Judgment Order at 22 (citing *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, 195 Cal. App. at 1051). Here, the testimony of O'Connor, Minna and Kostelni was consistent that Kostelni and O'Connor had a history of business disputes. The evidence further reflected that Farina did not provide financial information about Kostelni in support of its request to change the Lease. Moreover, given that Giacomazzi had openly proposed to O'Connor that the modified Lease would essentially be a sham used to mislead ABC, O'Connor reasonably believed that Farina's efforts to add Kostelni to the Lease were somehow related to illegal or unethical conduct. In short, it is clear from the evidence presented at trial that O'Connor would not have approved the sublease had he been informed of it and would have had a reasonable basis for refusing to approve the sublease. Under these circumstances, Farina's failure to notify O'Connor of the Kostelni sublease or obtain 700 Valencia's consent as required under the Lease constituted a material breach of the terms of the Lease. For the same reasons, the Court finds that the breach was willful for the purposes of California Civil Code section 3275.

## IV. CONCLUSION

For the reasons stated above, the Court concludes that Farina has been in unlawful possession of the Property since April 30, 2015 and therefore, that 700 Valencia is entitled to judgment in its favor on its unlawful detainer action, Case No. C-15-4931. For the same reasons, 700 Valencia is entitled to judgment in its favor on all of the claims in Case No. C-15-2286 except Claim Four (breach of construction contract) and Claim Five (return of security deposit).

The parties are instructed to meet and confer on the specific remedy to which 700 Valencia is entitled and to submit to the Court by **April 21, 2017** a joint Case Management Statement that addresses that issue and proposes a schedule for the remainder of the case.  A Case Management Conference is set for **Friday, May 5, 2017 at 2:00 p.m.**

**IT IS SO ORDERED.**

Dated: February 27, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge

12