ARNOLD & PORTER KAYE SCHOLER LLP
Jonathan W. Hughes (No. 186829)
jonathan.hughes@apks.com
S. Zachary Fayne (No. 307288)
zachary.fayne@apks.com
Three Embarcadero Center, 10th Floor
San Francisco, California 94111-4024
Telephone:  +1 415.471.3100
Facsimile:  +1 415.471.3400

Attorneys for Plaintiff
700 VALENCIA STREET, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| 700 VALENCIA STREET, LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>FARINA FOCACCIA & CUCINA ITALIANA, LLC, a Delaware Limited Liability Company,<br><br>Defendant. | Case No.: 15-cv-04931-JCS<br>Related Case No.: 15-cv-02286-JCS<br><br>**DECLARATION OF GARY GREENFIELD IN SUPPORT OF PLAINTIFF 700 VALENCIA STREET, LLC'S MOTION FOR ATTORNEYS' FEES**<br><br>Date:  December 15, 2017<br>Time:  9:30 a.m.<br>Place:  Courtroom G<br>        450 Golden Gate Avenue<br>        15th Floor<br>Judge:  Joseph C. Spero |

I, Gary Greenfield, declare as follows:

1. I am making this Declaration in support of the Motion for Attorneys' Fees by 700 Valencia Street, LLC ("700 Valencia" or "plaintiff") in this action ("Motion").[1] I have personal knowledge of the matters set forth in this Declaration, and, if called upon to testify, I could and would competently testify thereto.

2. I have been retained by Arnold & Porter Kaye Scholer LLP ("APKS"), counsel to 700 Valencia, to provide my analysis and opinions regarding the rates being sought on the Motion.

### Background

3. I am the founder of Litigation Cost Management (LCM), based in Oakland, California. LCM commenced business in 1991. LCM is in the business of consulting regarding legal fee-related issues. As part of our business, we regularly conduct analyses of both legal and expert witness fees in litigation about the reasonableness and appropriateness of the hours and rates billed or being sought on motions or applications for fees and at trials and arbitrations. We also consult with clients regarding how to manage their outside litigation more effectively and efficiently. LCM works with both law firms and clients of law firms in undertaking its analyses and consulting about effective litigation management.

4. Prior to starting LCM in January, 1991, I was a partner in the law firm of Shartsis, Friese & Ginsburg in San Francisco, California, where I was a litigator for fifteen years, having become a partner in the firm in 1981. During my career at my former law firm, I handled general commercial litigation, from pre-filing preparation and negotiations through trials and appeals. I handled litigation of varying types, including breach of contract, constitutional law, securities, fraud, bankruptcy litigation, intellectual property, unfair competition, business dissolution disputes and civil rights litigation. I represented both plaintiffs and defendants. I handled both contingency cases and cases where we were compensated on an hourly basis. I graduated from the University of

---

[1] 700 Valencia was also the defendant in the Breach of Contract Action described in the text below, but for simplicity, I will refer to it at times as "plaintiff" in this Declaration.

California, Berkeley, School of Law in 1975 and received my undergraduate degree from Stanford University in 1971. A copy of my Resume is attached hereto as Exhibit **1**.

5. Since LCM was founded, I have conducted several hundred analyses of the legal and expert witness fees and expenses in cases of various types and sizes. These have included individual actions, multi-party suits and class actions, covering the full range of civil litigation, such as patent, copyright, trademark, antitrust, Lanham Act, private equity fund, real property, False Claims Act, ERISA, bankruptcy, tax, breach of contract, securities, antitrust, environmental, insurance coverage and bad faith, discrimination, disability, civil rights, constitutional law, inverse condemnation, personal injury and products liability cases. I have myself been personally involved in, conducted analysis in and supervised each of these analyses. As part of my work on these projects, I have prepared and submitted numerous reports on attorneys' fees issues, both on behalf of parties opposing fee applications and on behalf of law firms or clients seeking to recover their fees.

6. I have qualified and testified previously as an expert witness in litigation (trials or arbitrations) on at least twenty occasions regarding legal and expert witness fees and have supplied testimony in the form of declarations or affidavits on hundreds of other occasions, again both on behalf of parties seeking to recover their attorneys' fees and parties opposing requests for attorneys' fees.

7. I was appointed a Special Master to analyze and report to the San Francisco Superior Court regarding the fees and expenses of various law firms and experts in an insurance company conservation proceeding before that Court.

8. As part of my work, I also consult with law firms and clients of law firms regarding law firm billing practices, effective litigation management, and legal bill analysis and auditing procedures. I have lectured and conducted seminars for clients and law firms in each of these areas.

9. I have taught or been a speaker at a number of programs regarding analysis of legal fees, legal bill auditing and litigation management. I have been an instructor for the National Association of Legal Fee Analysis.

10. For purposes of my analyses in these various cases and my consulting work, we have received and analyzed the time entries, billing rates and expenses billed in many hundreds of cases,

involving law firms and law firm offices across the country. I also regularly review judicial decisions and articles dealing with attorneys' fees, billing rates and litigation management issues, surveys and articles regarding billing rates being charged in the legal industry, and have attended seminars (including where I have been an instructor) where issues relating to attorneys' fees and litigation management issues have been the topic. As a result, I am familiar with typical and commonly accepted billing practices among law firms, as well as the rates typically charged by lawyers of various experience levels and expertise both nationally and in various parts of the United States.

11. A major aspect of my work is to review and analyze bills and time entries from law firms. The bills virtually always contain (or we otherwise obtain for purposes of my analysis) the rates being charged for the various billers in the law firms whose fees I am analyzing. As a result, we have acquired and I have reviewed a large quantity of information regarding the rates being charged by law firms of various sizes and types (ranging from solo practices to large, international firms, as well as "public interest" firms) and hundreds of lawyers of various expertise and levels of experience. I review these rates on a regular basis, and we maintain the rates we receive in a database (the "LCM rate database"). I also review databases of rates and surveys of billing rates published by legal periodicals and assembled by other legal consultants, including the Valeo Partners rate database, Thomson Reuters Legal Billing Report, the Wolters Kluwer Real Rate Report, the ALM Survey of Law Firm Economics, the National Law Journal Billing Report and others. In my experience, the most extensive rate information is contained in the database maintained by Valeo Partners (the "Valeo database").[2] I also review materials reflecting rates filed in cases other than those in which I am involved, analyses of other experts on rates, and judicial

---

[2] Valeo gathers data from court filings and other public records where law firms have affirmed under oath that the rates they are charging for the individuals in those cases (who are specifically identified) are the actual rates charged to their regular fee-paying clients or have been awarded in court. Valeo includes information about the various individuals' year of graduation and year of admission to the Bar, and organizes the rates by billing year and areas of work, among other categories. It further provides information about the filing from which the information was obtained so one can verify its accuracy. It currently has over 240,000 entries in its database, from over 1200 firms of varying sizes, nationally and internationally.

decisions which discuss rates sought and awarded in cases in which I am not involved. As a result, I am familiar with the range of rates charged by law firms for various types of litigation in various parts of the United States, including the Northern District of California.

12. I have provided testimony in a number of cases regarding the reasonableness and appropriateness of rates sought in various types of litigation.

**Materials reviewed, interviews conducted, prior testimony and compensation**

13. In undertaking my analysis and preparing this Declaration, I reviewed the following materials: the time entries billed to and sought by 700 Valencia in this action; the APKS website; the LinkedIn website page of Earl L. Bohacheck, counsel for Farina Foccacia & Cucina Italiana, LLC ("Farina") in this action; Declarations filed in support of this Motion by 700 Valencia; pleadings, motions and Orders filed in this action; rate information contained in the LCM rate database and in the Valeo database; and the Declaration of Jonathan Hughes filed in support of this Motion.

14. I interviewed Jonathan Hughes and Zachary Fayne of APKS to obtain background information about the case.

15. Attached hereto as Exhibit **2** is a list of my court, arbitration and deposition testimony in the last four years.

16. I am being compensated at the rate of $550 per hour for my work in preparing this Declaration and the related analysis.

**The litigation**

17. This litigation arises out of a commercial lease between 700 Valencia and Farina for property located at 702-06 Valencia Street in San Francisco, California (the "lease"). The lease contained two options to renew the lease and an option to purchase the property.

18. The litigation was commenced by Farina's filing a Complaint for Declaratory Relief; Specific Performance of Written Contract; and Breach of the Implied Covenant of Good Faith and Fair Dealing in the federal court for the Northern District of California on May 21, 2015 (the "Breach of Contract Action"). On May 22, 2015, 700 Valencia filed an unlawful detainer action in the San Francisco Superior Court. On August 13, 2015, Farina filed a First Amended Complaint,

adding claims for "Breach of Construction Contract/Construction Defects" and "Return of Security Deposits." On September 22, 2015, 700 Valencia filed a second unlawful detainer action in San Francisco Superior Court which was removed to the federal court on October 27, 2015 (the "Unlawful Detainer Action"). The cases ultimately were consolidated on November 4, 2016.

19. It is my understanding that, during the course of the litigation, 700 Valencia became uncomfortable with its original counsel in the litigation, that they consulted with Mr. Hughes of APKS, and, after considering whether to retain other firms, decided to retain APKS to substitute in for its original counsel.[3] That substitution took place in February, 2016.[4]

20. During the course of the litigation, there were multiple motions by the parties, "letter brief" discovery disputes, written discovery, document productions, third-party subpoenas, and depositions.

21. Ultimately, there was a two-day bench trial, resulting in Findings of Fact and Conclusions of Law in which the Court concluded that 700 Valencia was entitled to possession of the leased premises and judgment as to three of the five claims by Farina in the Breach of Contract Action. Farina filed post-judgment motions to overturn the judgment, which the Court denied. This Motion followed.

22. In the Motion, 700 Valencia is seeking $707,864.93 in attorneys' fees. Hughes Decl. ¶ 12.

23. I have been asked to provide my opinion as to whether the rates sought on the Motion are reasonable and appropriate.

## Analysis

24. In assessing the reasonableness of rates where fees are being sought under Code of Civil Procedure Section 1033.5 and Civil Code Section 1717, the inquiry is whether the rates sought are consistent with the "market" for comparable lawyers doing comparable work. Normally, the

---

[3] Based on my review of the Court's Order Denying Motion to Compel Arbitration, etc., filed February 10, 2016, it is not surprising to me that 700 Valencia decided it should change counsel.
[4] All of the fees sought on the Motion were billed by APKS.

geographic area of the "market" to be considered is the forum, which in this case is the Northern District of California ("Northern District").[5]

25. First, the rates charged 700 Valencia here were the regular rates (with some discounts) that APKS regularly charged its clients for work billed on an hourly basis in San Francisco. Hughes Decl. ¶ 16. The invoices were paid on an on-going basis through the litigation. *Id.* Thus, the rates charged and sought here reflect the "market" since these are the rates the firm charges and is paid by its clients on a regular basis in the market.[6]

26. Moreover, I am familiar from my work in other cases (and review of the various materials described in the Background section above) with the rates charged for legal services in the Northern District, having done legal fee analyses in numerous cases in both state and federal courts in various parts of the Northern District, including San Francisco, San Mateo, Santa Clara, Alameda and other counties within the District. The rates charged and being sought here are consistent with the rates charged by comparable lawyers and paralegals performing comparable services in the Northern District.[7]

27. Among the principal factors to be considered in assessing the reasonableness of the rates charged (certain of which are also relevant to the overall reasonableness of the fees) are the nature and complexity of the litigation; what was at stake or at risk for the parties; the results obtained; and the experience, expertise and reputation of the lawyers.

---

[5] While the rates in the market in the forum are presumptively the rates to consider, there are situations where circumstances may require defining the market as something other than the forum, such as the entire state or nation. In this case, there would appear to be no reason not to consider the rates charged in the forum as the appropriate market.

[6] Plaintiff considered the option of retaining a firm with lower rates, but ultimately chose APKS. Based on what was at stake in the case, its complexity, and the results obtained, there is no basis to conclude that the decision to retain APKS was an unreasonable one.

[7] Normally, rate analyses begin with market reflected by the forum, which is the Northern District. Even if one considered the market to be San Francisco, given that the action was filed in the San Francisco Division of the Northern District, the rates charged and sought would be consistent with the market and reasonable.

### Nature and complexity of the litigation, what was at stake, and the results obtained

28. As stated above, this action involved a federal declaratory relief action and unlawful detainer action, which were then ultimately consolidated. There were multiple motions (including motions to dismiss, a motion to remand, a motion to compel arbitration, a motion for attorneys' fees by Luca Minna (one of the defendants in the unlawful detainer actions) (the "Minna Motion for Fees"), and a motion to consolidate.

29. Based on my review of the record and discussions with counsel for 700 Valencia, I understand that this lawsuit involved: (a) a factual dispute regarding whether Farina properly exercised its option to renew the Lease; (b) factual disputes regarding whether Farina breached the Lease, whether those breaches were material, and whether the alleged defaults constituted a grossly negligent, willful, or fraudulent breach of duty; (c) legal questions related to the intersection of option law and equitable principles regarding forfeiture; (d) legal issues related to defendant Minna's guaranty of the lease and relationships between various corporate entities, federal subject-matter jurisdiction, removal procedure, whether state or federal law governed the motion to compel arbitration, and other issues.

30. Ultimately there was the two-day trial, which resolved all the claims except the claims added in the First Amended Complaint.

31. This plainly was not a simple unlawful detainer action, but rather commercial litigation with various conflicting claims.

32. Plaintiff had substantial potential damages (the Court ultimately concluded that plaintiff had suffered $329,825.00 as damages for unlawful possession as of August 11, 2017 plus post-judgment damages at a rate of $395/day for each day that Farina remains in possession of the property). In addition to the potential lost rent and monetary issues alleged in the litigation, plaintiff had concerns regarding how the tenancy was impacting what was a very valuable commercial property in the Mission District in San Francisco and plaintiff's reputation. Hughes Decl. ¶ 2.

33. The results obtained were excellent—plaintiff obtained the right to possession of the property, judgment in the Unlawful Detainer Action and the right to recover its damages through the unlawful possession.

34. Given the nature of the litigation, what was at stake for 700 Valencia, and the results obtained, the decision to retain APKS, particularly given its experience with its initial counsel, was plainly reasonable.

**The expertise, experience, reputation of the lawyers, and the reasonableness of the rates**

35. With regard to the expertise, experience and reputation of the lawyers, first, regarding APKS overall, it is an excellent firm with an outstanding world-wide reputation, specializing in real estate matters including litigation, among a number of areas.

36. The lead lawyer in the litigation from APKS is Jonathan Hughes. Mr. Hughes graduated in 1996 from the University of California, Hastings College of the Law, as Order of the Coif (reflecting graduation in the top ten percent of the class). He was recognized by *California Lawyer* in 2015 as one of the Lawyers of the Year. He is an experienced litigator and trial lawyer, Hughes Decl. ¶ 4, and specializing in, among other areas, real estate litigation. *Id.* The rate being sought for Mr. Hughes is $790 per hour.[8] As acknowledged by Mr. Bohacheck in his Declaration filed in this action in support of the Minna Motion for Fees, that rate is within the market for commercial real estate litigators in San Francisco.[9]

37. As stated above, in my opinion as well, the rate sought for Mr. Hughes is within the market for experienced commercial real estate litigators in San Francisco.

38. In addition, in order to further evaluate the rates sought for Mr. Hughes and the other APKS billers, I looked at the rates in the LCM and Valeo databases billed by litigators in complex

---

[8] This reflects a blended average rate (or "blended rate") resulting from his time in 2016 being billed at $795 and his time in 2017 being billed at $751.50, based on a 10% discount from his standard rate of $835.

[9] Mr. Bohacheck asserted that a rate of $700 per hour was reasonable for his services and recognized that San Francisco lawyers of comparable experience would charge $750-$850 (Bohachek Declaration, paragraph 5). He also relies upon the Laffey Matrix, a source of rate information used in the Circuit for the District of Columbia and by some District Courts in the Ninth Circuit, which indicates that in Washington, D.C., the market upon which the Laffey Matrix is based, the rate for lawyers for work in 2015-16, with twenty or more years of experience, such as Mr. Hughes, is $796 per hour. Where the Laffey Matrix is used as a benchmark for rates outside of Washington, D.C., the practice is to adjust the rates for any difference in standard of living as reflected in the Consumer Price Index. Since San Francisco has a higher standard of living than Washington D.C., the rate of $796 per hour, which is already higher than the rate sought for Mr. Hughes, would be adjusted upward.

litigation for 2016. A summary of the rates, as discussed below, is set forth on Exhibit 3 hereto. In Mr. Hughes' case, I looked at litigators who had been out of law school for from thirteen to twenty-seven years.[10] The range of rates is $210 to $1,300 per hour. The rate being sought for Mr. Hughes is within that range and is at approximately the 62nd percentile of that data, and is reasonable and an appropriate rate for his work in this litigation.

39. There were two associates who billed substantial hours in the litigation. The associate on the case through the trial and the biller with the overall highest number of hours was Benjamin Wolinsky, a 2010 graduate of the Georgetown University Law Center, who is now an Assistant United States Attorney, having left APKS to join the United States Attorneys' office in the Eastern District of California. The rate being sought for Mr. Wolinsky's work is $675 per hour. I looked at the range of rates in the LCM rate database for the Northern District for lawyers who had graduated from 2007 through 2013. The rates ranged from $225 to $875 per hour. See Exhibit 3. The rate being sought for Mr. Wolinsky is within that range of rates, is at approximately the 79th percentile within that range, and, in my opinion, is reasonable and an appropriate rate for the work he performed in the litigation.

40. Neda Khoshkhoo was the other associate working on the case during the pretrial period. She graduated from the University of California, Berkeley Law, in 2015. To evaluate her rate, I looked at the rates of 2015 law school graduates for 2016. The rate being sought for her work is $420 per hour. The range of rates in the LCM rate database for a 2015 law school graduate in 2016 in the Northern District was $285 to $470 per hour. See Exhibit 3. The rate being sought for Ms. Khoshkhoo is within that range of rates, is at approximately the 58th percentile within that range, and is reasonable and an appropriate rate for the work she performed in the litigation.

41. S. Zachary Fayne has been the primary associate working on this Motion. He is a 2009 *cum laude* graduate of Harvard Law School. The rate being sought for Mr. Fayne's work is

---

[10] I look at a range of years to broaden the sample of rates available and also because, after a certain number of years out of law school, rates are not as closely related to years out of law school, but to other factors such as size of the firm, nature of the practice and reputation of the biller, and thus lawyers with the same rates will typically have varying years of experience.

$671 per hour. I looked at the range of rates for 2016 in the Northern District for lawyers who had graduated from 2005 through 2013. The rates ranged from $225 to $940 per hour. See Exhibit 3. The rate of Mr. Fayne is within that range, is at approximately the 73rd percentile within that range, and, in my opinion, is reasonable and an appropriate rate for the work he has performed in the litigation.

42.   The rate of Kenneth Neale, a partner at APKS who specializes in real estate and who billed 1.4 hours to the litigation to provide some real estate-related tax advice, was $775 per hour. He is a 1986 law school graduate and his rate, which was lower than that of Mr. Hughes, is reasonable and an appropriate rate for the work he did, as the analysis for Mr. Hughes above indicates.[11]

43.   The paralegals working on the case were billed at $335 to $355 per hour. Hughes Decl. ¶ 16. That is reasonable and within the market for paralegals in the Northern District.

I declare under penalty of perjury under the laws of the state of California and the laws of the United States of America that the foregoing is true and correct.

Executed this 31st day of October, 2017, in Alameda County, California.

_____
GARY GREENFIELD

---

[11] Since Mr. Hughes' rate is consistent with the market and reasonable, the same analysis would apply to Mr. Neale's rate since he is more senior.

# EXHIBIT 1

## RESUME

## GARY GREENFIELD

### PROFESSIONAL EXPERIENCE

#### LITIGATION COST MANAGEMENT

**January 1, 1991 to date**--Founder of Litigation Cost Management, a consulting firm which specializes in legal and expert fee analysis and consulting with clients respecting improving the management of their litigation.

##### Special Master

Appointed Special Master by San Francisco Superior Court to analyze fees and expenses of lawyers and expert witnesses

##### Expert consultant/witness

Qualified and testified in numerous court proceedings and arbitrations regarding attorneys' fees issues

##### Litigation management/auditing training and consulting

Consulting and training for both clients and law firms in litigation management and cost control and legal bill auditing and analysis

#### OTHER LEGAL EXPERIENCE

**October 1, 1975 to December 31, 1990**--Litigator in San Francisco law firm of Shartsis, Friese & Ginsburg. Handled complex litigation of various types, covering all stages of cases including trials in state and federal courts. Became partner on January 1, 1981.

### EDUCATION

**University of California at Berkeley (Boalt Hall)**--J.D., 1975. Member, California Law Review. Order of the Coif.

**Stanford University**--B.A., 1971. Phi Beta Kappa. Degree with Distinction.

**RESUME** (Page 2)

**ARTICLES**

"An Auditor Speaks to Law Firms," <u>The Recorder</u>, August 16, 1991

"Audits Often Signal a Management Failure," <u>Illinois Legal Times</u>, September, 1991

"Five Early Warning Signs of Potential Overbilling," <u>The Recorder</u>, October 24, 1991

"Estimating the Cost of a Case," <u>Corporate Legal Times</u>, January, 1992

"Litigation Management: It's All in the Mind," <u>Committee on Corporate Counsel Newsletter</u> (ABA Section of Litigation), February, 1992

"Keep High Litigation Costs Off Your Case," <u>Public Risk</u>, February, 1992

"How One Company Uses In-House Audits," <u>Corporate Legal Times</u>, June, 1992

"Litigation Management: What Law School Never Taught You," <u>California Lawyer</u>, July, 1992

"Harnessing the Cost of Legal Bills," <u>Risk Management</u>, January, 1993

"Strategies for Reducing Your Legal Bills," <u>Small Business Reports</u>, June, 1993

"Efficient Litigation: An Ethical Imperative?" <u>The American Lawyer</u>, April, 1994

"Fee Fight (Using A Legal Fee Auditor in Billing Disputes)," <u>Los Angeles/San Francisco Daily Journal</u>, February 28, 1997

"Legal Bill Auditing–Problems and Perspectives," <u>Law Governance Review</u>, Autumn, 1997

**RESUME** (Page 3)

**SEMINARS AND WORKSHOPS CONDUCTED**

    **American Management Association**--Two-day seminars in effective litigation management

    **Western Bankers' Association**--Multiple workshops across California on effective litigation management

    **Continuing Professional Education, Inc.**--Seminars in legal bill auditing and litigation management for financial professionals


**OTHER SPEAKING ENGAGEMENTS**

    National Association of Legal Fee Analysis (NALFA)

    ABA National Litigation Institute ("Applying TQM in Litigation")

    Practising Law Institute ("Litigation Management Supercourse")

    Los Angeles County Bar Association ("All About Fees")

    National Association of Government Guaranteed Lenders

    California Redevelopment Association

    Public Risk Management Association

# EXHIBIT 2

Trial, Arbitration and Deposition Testimony (Last Four Years)

1. *UnitedHealth Group, Inc. v. Lexington Insurance Company et al.,* United States District Court, D. Minn., No. 05-CV-01289;

2. *Calvo, Fisher & Jacob LLP v. Lujan*, San Francisco Superior Court, No. CGC-10-498299;

3. *Nixon Peabody LLP v. Shenkman*, San Francisco Superior Court, No. CGC-11-509533;

4. *Meyers Law Group, P.C. v. ULTIPRF LLC*, JAMS Arbitration No. 1100074315;

5. *Select Comfort Corporation v. Arrowood Indemnity Company*, D. Minn., No. 13-cv-02975-JNE-FLN;

6. *Rosen & Associates v. Kurz*, JAMS Arbitration No. 1220046413;

7. *Emulex Corporation et al. v. Marvell Semiconductor, Inc. et al., Santa Clara Superior Court*, Case No. 1:13-CV-251215;

8. *J.P. Morgan et al. v. Vigilant Insurance Company, et al.*, Supreme Court of the State of New York, County of New York, Index No. 600979/09;

9. *Market Lofts Community Association v. National Union Fire Insurance Company of Pittsburgh, PA*, C.D. Cal., No. CV 15-03093-RGK (MANx);

10. *Health First, Inc., et al. v. Capitol Specialty Insurance Corporation, et al.*, Case No. 6:15-cv-718-Orl-41DAB (M.D. Fla.); and

11. *Fox Paine & Company LLC and Saul A. Fox v. Houston Casualty Company and Equity Risk Partners, Inc.*, Supreme Court of the State of New York of Westchester County, No. 52607/2014

# EXHIBIT 3

Litigation Cost Management                **Summary of Rates**                                    700 Valencia

| Biller | Sought Rate (Blended Avg., $/Hour) | Year of Graduation | Range of Years | Range of Rates $/Hour | Percentile | Average ($/Hour) | Median ($/Hour) |
|---|---|---|---|---|---|---|---|
| Hughes, Jonathan W. | 790 | 1996 | 1989-2003 | 210-1300 | 62 | 745 | 760 |
| Wolinsky, Benjamin J. | 675 | 2010 | 2007-2013 | 225-875 | 79 | 559 | 595 |
| Fayne, Samuel Z. | 671 | 2009 | 2005-2013 | 225-940 | 73 | 574 | 610 |
| Khoshkhoo, Neda A. | 420 | 2015 | 2015 | 285-470 | 58 | 406 | 410 |